## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| EDEN FOODS, INC.; | ) | |
| MICHAEL POTTER, Chairman, President, | ) | |
| and Sole Shareholder of Eden Foods, Inc., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| KATHLEEN SEBELIUS, Secretary of the | ) | Case No. 2:13-cv-11229 |
| United States Department of Health and | ) | |
| Human Services; UNITED STATES | ) | FIRST AMENDED COMPLAINT |
| DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES; SETH D. HARRIS, | ) | Judge Denise Page Hood |
| Acting Secretary of the United States | ) | |
| Department of Labor; UNITED STATES | ) | Magistrate Judge Mark A. Randon |
| DEPARTMENT OF LABOR; JACK LEW, | ) | |
| Secretary of the United States Department of | ) | |
| the Treasury; and UNITED STATES | ) | |
| DEPARTMENT OF THE TREASURY, | ) | |
| | ) | |
| Defendants. | ) | |

THOMAS MORE LAW CENTER
Richard Thompson, Esq. (P21410)
Erin Mersino, Esq. (P70886)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
emersino@thomasmore.org
(734) 827-2001

*Attorneys for Plaintiffs*

STUART F. DELERY
Acting Assistant Attorney General

BARBARA L. McQUADE
United States Attorney
Eastern District of Michigan

SHEILA M. LIEBER
Deputy Branch Director

BRADLEY P. HUMPHREYS
Trial Attorney, VA Bar No. 83212
Civil Division, Federal Programs Branch
United States Department of Justice
20 Massachusetts Ave. NW
Washington, DC 20001
Tel: (202) 514-3367
Fax: (202) 616-8470
E-Mail: bradley.p.humphreys@usdoj.gov

*Attorneys for Defendants*

1

## FIRST AMENDED COMPLAINT

Now come Plaintiffs Eden Foods, Inc. (hereinafter "Eden Foods") and Michael Potter (collectively "Plaintiffs"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 15, and bring this First Amended Complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof state the following upon information and belief:

## NATURE OF THE ACTION

1.      This is a case about religious freedom.  Thomas Jefferson, a Founding Father of our country, principal author of the Declaration of Independence, and our third president, when describing the construct of our Constitution proclaimed, "No provision in our Constitution ought to be dearer to man than *that which protects the rights of conscience* against the enterprises of the civil authority."  Letter from Thomas Jefferson, United States Office of the President, to the Soc'y of the Methodist Episcopal Church at New London, Conn. (Feb. 4, 1809) *cited in People v. Dejonge*, 442 Mich. 266, 278 (1993) (emphasis added).

2.      This is a challenge to regulations ostensibly issued under the "Patient Protection and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119) and the "Health Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (collectively known and hereinafter referred to as the "Affordable Care Act") that force individuals to violate their deepest held religious beliefs.

3.      The Affordable Care Act, through a Mandate from the United States Department of Health and Human Services, attacks and desecrates a foremost tenet of the Catholic Church, as stated by Pope Paul VI in His 1968 encyclical *Humanae Vitae*, that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent

2

procreation, whether as an end or as a means"—including contraception, abortion, and abortifacients—is immoral and unnatural.

4.      One of the provisions of the Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of the United States Department of Health and Human Services to determine what would constitute "preventative care" under the mandate. 42 U.S.C § 300gg–13(a)(4).

5.      Without notice of rulemaking or opportunity for public comment, the United States Department of Health and Human Services, the United States Department of Labor, and the United States Department of Treasury adopted the Institute of Medicine ("IOM") recommendations in full and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.

6.      The Mandate requires all insurance issuers (e.g. Blue Cross/ Blue Shield of Michigan) to provide contraception, abortion, and abortifacients in all of its insurance plans, group and individual.

7.      Health Resources and Services Administration also issued guidelines adopting the IOM recommendations.  (http://www.hrsa.gov/womensguidelines).

8.      Under the IOM guidelines, the Mandate requires *all* insurance issuers to provide not only contraception, but also abortion, because certain drugs and devices such as the "morning-after pill," "Plan B," and "ella" come within the Mandate's and Health Resources and

Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

9.      The Mandate forces employers and individuals to violate their religious beliefs because it requires employers and individuals to pay for insurance from insurance issuers which fund and directly provide for drugs, devices, and services which violate their deeply held religious beliefs.

10.      Since under the Mandate all insurance issuers must provide what the United States Department of Health and Human Services has deemed "preventive care," employers and individuals are stripped of any choice between insurance issuers or insurance plans to avoid violating their religious beliefs.

11.      The United States Department of Health and Human Services in an unprecedented despoiling of religious rights forces religious employers and individuals, who believe that funding and providing for contraception, abortion, and abortifacients is wrong, to participate in acts that violate their beliefs and their conscience—and are forced out of the health insurance market in its entirety in order to comply with their religious beliefs.

12.      Plaintiffs seek a Preliminary Injunction and Permanent Injunction, enjoining Defendants from implementing and enforcing provisions of the regulations promulgated under the Affordable Care Act, specifically the Mandate.  The Mandate violates Plaintiffs' rights to the free exercise of religion under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

13.      Plaintiffs also seek a Declaratory Judgment that the regulations promulgated under the Affordable Care Act, specifically the Mandate, violate Plaintiffs' rights to the free

exercise of religion under the First Amendment to the United States Constitution, the Religious Freedom Restoration Act, and the Administrative Procedure Act.

14.     The Affordable Care Act's contraception, abortion, and abortifacient mandate violates the rights of Plaintiffs Eden Foods and Michael Potter.

15.     Plaintiff Michael Potter is the Chairman, President, and sole shareholder of Plaintiff Eden Foods.

16.     Plaintiffs employ 128 full-time employees, are subject to monetary penalties under the Affordable Care Act, and are forced under the Mandate by penalty of heavy fines to conduct business in a manner that violates their religious faith by providing and funding contraceptives and abortifacients, which violates deeply held religious beliefs.

17.     Plaintiffs bring this action to vindicate not only their own rights, but also to protect the rights of all Americans who care about our Constitutional guarantee of free exercise of religion.

## JURISDICTION AND VENUE

18.     This action in which the United States is a defendant arises under the Constitution and laws of the United States.  Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1346.

19.     Plaintiffs' claims for declaratory and preliminary and permanent injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, by 42 U.S.C. § 2000bb-1, and by the general legal and equitable powers of this Court.

20.     Venue is proper under 28 U.S.C. § 1391(e) because this is the judicial district in which Plaintiffs are located.

## **PLAINTIFFS**

21.     Plaintiff Eden Foods is incorporated under the laws of the State of Michigan.

22.     Plaintiff Eden Foods is registered at 701 Tecumseh Road, Clinton, Michigan 49236.

23.     Plaintiff Eden Foods employs 128 full-time employees.

24.     Plaintiff Eden Foods is subject to the Mandate.

25.     Plaintiff Michael Potter is the Chairman, President, and sole shareholder of Plaintiff Eden Foods.  Plaintiff Michael Potter is an individual and a citizen of the State of Michigan and the United States.

26.     Plaintiff Michael Potter is an original founder of Plaintiff Eden Foods.

27.     Plaintiff Eden Foods is Plaintiff Michael Potter's livelihood and life.  Plaintiff Michael Potter has devoted and continues to devote countless hours to Plaintiffs Eden Foods' success and advancement.

28.     Plaintiff Michael Potter was instrumental in starting Plaintiff Eden Foods in Ann Arbor, Michigan in the late 1960s.

29.     Plaintiff Eden Foods began as Eden co-op.

30.     In the late 1960s, natural and organic foods were not common, so members of the co-op actually traveled rural roads, knocking on doors for farmers to grow food using organic methods.

31.     The Eden co-op grew into a natural food store offering whole grains, beans, soyfoods, sea vegetables, miso, cereals, vegetable oils, seed and nut butters, and the like. Eden co-op expanded with the addition of a cafeteria, bakery, and books.  The expansion became

6

known as the Eden Deli.  It was one of very few places in the United States where one could get natural, organic, and macrobiotic food.

32.     Soon health food stores called asking to carry Eden's foods, and Plaintiff Eden Foods began to take shape.

33.     In 1972, Plaintiff Eden Foods opened its first warehouse, solidifying Plaintiff Eden Foods as an important natural food source for the United States and Canada.

34.     Plaintiff Eden Foods is a natural food company which strives to provide only the finest food from known and trusted growers and handlers.

35.     Plaintiff Eden Foods is the oldest natural and organic food company in North America and the largest independent manufacturer of dry grocery organic foods.

36.     Plaintiff Eden Foods is deeply rooted in Michigan outside of Ann Arbor, and manages grower relations, manufacturing, trucking, quality control, customer and retailer services, marketing, import/export, accounting, databases and websites from that location.

37.     Plaintiff Eden Foods is centered on macrobiotics—eating a diet of whole grain and seasonal local plant foods that are not nutrient depleted and *without toxic chemical adulteration*.

38.     Plaintiff Eden Foods strives to maintain integrity and transparency in all they do and obtains Superior ratings from AIB International, their highest rating for food safety and sanitation from the most prestigious third-party certifier in North America.

39.     Plaintiff Eden Foods' design, construction, and operation of their warehouse reflect their commitment to sustainable growth and follow "LEED" (Leadership in Energy and Environmental Design) principles.  Plaintiff Eden Foods in building their most recent warehouse

utilized 80% recycled steel forged in the area.  Plaintiff Eden Foods uses energy efficient lights and insulation, preserves native flora, and is good-neighbor landscaped.

40.     Plaintiff Eden Foods tracks the environmental impact of its food upstream with suppliers, through company operations, and downstream monitoring all its social impacts. Energy consumption and waste are tracked using custom in-house tools.

41.     In 2009, Plaintiff Eden Foods was selected as the best food company in the world, and the third best company overall by The Better World Shopping Guide.

42.     The Better World Shopping Guide acknowledged Plaintiff Eden Foods' outstanding record in social and environmental responsibility.  The company earned an A+ and an A rating in ten food categories.

43.     Plaintiff Eden Foods only provides foods that are Non-GMO and third party certified organically grown, handled, and processed. They are locally-grown focused and maintain direct relations with, and payment directly to, family farms, many of which rival or exceed their commercial counterparts in size and productivity.

44.     Plaintiff Eden Foods' products, methods, and accomplishments are described by critics as: tasteful, nutritious, wholesome, principled, unrivaled, nurturing, pure.

45.     Plaintiff Eden Foods has won several awards including: *Grocery Headquarters* Trailblazer Award Best of the Best in Wellness, January 2013; *Men's Health* Best Foods for Men Black Bean & Quinoa Chili, Refried Pinto Beans, Chickpeas, November 2012; *Whole Living* Green Giant Visionary Award, October 2012; *Women's Health* Best Food for Women Black Bean & Quinoa Chili, September 2012; *Clean Eating* "Favorite Fiber Booster" Foodie Award Black Beans, July 2012; *Vegetarian Times* Readers' Faves Foodie Award Soba, November 2011; GPI Friend of Glass Packaging Award, November 2011; *Men's Health*

Best Foods for Men Black Beans & Spicy Refried Black Beans, November 2011; NASFT Best of the Best Organic Concord Grape Juice, May 2011; *Grocery Headquarters* Trailblazer Award Edensoy, January 2011; *Women's Health* Best Food for Women 100% Whole Grain Udon, November 2010; *Men's Health* Best Foods for Men Beans & Pumpkin Seeds, November 2010; *Vegetarian Times* Readers' Faves Foodie Awards Red Quinoa & Apple Cherry Butter, September 2010; *Men's Health* Best Organic Food Spicy Pumpkin Seeds, April 2010; Responsible Packaging Award, April 2010; Best Practices by a Big Food Brand, April 2010; *Grocery Headquarters* Trailblazer Award Chili, January 2010; Michigan Trucking Association, Fleet Safety Award 1987 to 2009; *Women's Health* Top 125 Best Packaged Foods for Women Quinoa & Wild Berry Mix, September 2009; Vegetarian Times Best Go-To Grain Wild Rice, September 2009; Cornucopia Institute, Organic Score Card Five Bean Rating, June 2009; The Better World Shopping Guide #1 Food Company in the World, February 2009; Nutrition Action Healthletter Thumbs Up, Unseasoned Beans, February 2009; *Grocery Headquarters* Trailblazer Award Red Quinoa, January 2009; San Francisco Chronicle Taster's Choice Hall of Fame Apple Sauce, April 2008; San Francisco Chronicle Taster's Choice Tamari, May 2007; *Men's Health* 125 Best Foods for Men Refried Kidney Beans, June 2006; Michigan Organic Foods & Farm Alliance community Service Award May 2006; Nutrition Action Healthletter Best Bite Refried Beans, September 2004; *Men's Health* 125 Best Foods for Men Refried Kidney Beans, June 2004; Alive Magazine Award of Excellence Apple Juice, November 2002; Khalsa International Industries and Trade, Socially Responsible Business Award, October 2001; Cook's Illustrated Highly Recommended Shoyu, January 2000; Prevention Magazine All Around Best Buy Olive Oil, September 1999.

     46.     Plaintiff Eden Foods offers certified kosher and pareve foods.

47.     The production of Plaintiff Eden Foods' kosher foods are Rabbinically supervised.  The Rabbi visits on a regular basis.  He inspects the machines prior to production and verifies that every step required by Jewish Law has been observed and fulfilled.  Ninety-one percent of all foods produced by Plaintiff Eden Foods are kosher and marked with a Circle-K on the package.

48.     The term "pareve" indicates all ingredients, food contact surfaces, processing, and storage equipment are certified meat and dairy free.

49.     Plaintiffs serve their customers with honesty and integrity by providing the best, healthiest, and most natural foods and products available.

50.     Plaintiff Michael Potter has also devoted his life to the Catholic faith.

51.     Plaintiff Michael Potter is Catholic and follows the teachings of the Catholic faith as defined by the Magisterium (teaching authority) of the Catholic Church.

52.     Plaintiff Michael Potter is guided by his religious beliefs.

53.     Plaintiff Michael Potter holds religious beliefs that prevent him from participating in, paying for, training others to engage in, or otherwise supporting contraception, abortion, and abortifacients.

54.     Plaintiff Michael Potter strives to follow the tenets of the Catholic faith in his business practices.

55.     Plaintiff Michael Potter is responsible for setting policies governing the conduct of all phases of business of Plaintiff Eden Foods.

56.     Prior to the issuance of the Mandate, Plaintiffs engineered an insurance policy with Blue Cross/Blue Shield of Michigan which specifically excluded contraception and

abortifacients, and exempts Plaintiffs from providing, paying, contributing, or supporting contraception and abortion for others.

57. Plaintiffs specifically excluded what Blue Cross/Blue Shield of Michigan historically categorized as "Lifestyle Drugs"—a category which encompassed contraceptives and other drugs such as Viagra.

58. Plaintiffs obtained these exclusions due to their deeply held religious beliefs.

59. Plaintiff Eden Foods has never offered insurance which included coverage for contraception and abortifacients.

60. Plaintiffs' employees receive insurance under this engineered insurance policy with Blue Cross/Blue Shield of Michigan which specifically excludes contraception and abortifacients, and exempts Plaintiffs from providing, paying, contributing, or supporting contraception and abortifacients for others.

61. Plaintiff Michael Potter and Plaintiff Eden Foods ensured that their insurance policy contained these exclusions to reflect their deeply held religious beliefs.

62. Based on the teachings of the Catholic Church, and their deeply held religious beliefs, Plaintiffs do not believe that contraception or abortifacients are properly understood to constitute medicine, health care, or a means of providing for the well being of persons. Indeed, Plaintiffs believe these procedures almost always involve immoral and unnatural practices.

## **DEFENDANTS**

63. Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing the Mandate.

64. Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS"). In this capacity, she has responsibility for the operation and management of HHS. Defendant Sebelius is sued in her official capacity only.

65. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

66. Defendant Seth D. Harris is the Acting Secretary of the United States Department of Labor. In this capacity, he holds responsibility for the operation and management of the United States Department of Labor. Defendant Harris is sued in his official capacity only.

67. Defendant United States Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

68. Defendant Jack Lew is the Secretary of the United States Department of the Treasury. In this capacity, he holds responsibility for the operation and management of the United States Department of Treasury. Defendant Lew is sued in his official capacity only.

69. Defendant United States Department of Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the regulation which is the subject of this lawsuit.

## FACTUAL ALLEGATIONS

**Plaintiffs' Religious Beliefs**

70. Plaintiffs hold and actively profess religious beliefs in accordance with the traditional Christian teachings on the sanctity of life. Plaintiffs believe that each human being bears the image and likeness of God, and therefore that all human life is sacred and precious,

from the moment of conception.  Plaintiffs therefore believe that abortion ends a human life and is a sin.

71.     Plaintiffs' religious beliefs also include traditional Christian teaching on the nature and purpose of human sexuality. In particular, Plaintiffs believe, in accordance with Pope Paul VI's 1968 encyclical *Humanae Vitae*, that human sexuality has two primary purposes: to "most closely unit[e] husband and wife" and "for the generation of new lives."  Accordingly, Plaintiffs believe and actively profess, with the Catholic Church, that "[t]o use this divine gift destroying, even if only partially, its meaning and its purpose is to contradict the nature both of man and of woman and of their most intimate relationship, and therefore it is to contradict also the plan of God and His Will."  Therefore, Plaintiffs believe and teach that "any action which either before, at the moment of, or after sexual intercourse, is specifically intended to prevent procreation, whether as an end or as a means"—including contraception, abortifacients, and abortion—is immoral and unnatural.

72.     Furthermore, Plaintiffs subscribe to authoritative Catholic teaching about the proper nature and aims of health care and medical treatment.  For instance, Plaintiffs believe, in accordance with Pope John Paul II's 1995 encyclical *Evangelium Vitae*, that "'[c]ausing death' can never be considered a form of medical treatment," but rather "runs completely counter to the health-care profession, which is meant to be an impassioned and unflinching affirmation of life."

73.     Several leaders within the Catholic Church have publicly spoken out about how the Mandate is a direct violation of Catholic Faith.

74.     Cardinal Timothy Dolan, Archbishop of New York and President of the United States Conference of Catholic Bishops wrote, "Since January 20 [2012], when the final, restrictive HHS Rule was first announced, we have become certain of two things: *religious*

*freedom* is under attack, and we will not cease our struggle to protect it.  We recall the words of our Holy Father Benedict XVI to our brother bishops on their recent *ad limina* visit: 'Of particular concern are certain attempts being made to limit that most cherished of American freedoms, the freedom of religion.' . . . We have made it clear in no uncertain terms to the government that we are not at peace with its invasive attempt to curtail the *religious freedom* we cherish as Catholics and Americans." (http://www.usccb.org., last visited March 2, 2012).

75.     Archbishop Charles J. Chaput, the Archbishop of Philadelphia, has expressed that the Affordable Care Act and the Mandate seek "to coerce Catholic employers, private and corporate, to violate their religious convictions . . . [t]he HHS mandate, including its latest variant, is belligerent, unnecessary, and deeply offensive to the content of Catholic belief . . . The HHS mandate needs to be rescinded.  In reality, no similarly aggressive attack on religious freedom in our country has occurred in recent memory . . . [t]he HHS mandate is bad law; and not merely bad, but dangerous and insulting.  It needs to be withdrawn—now." (http://the-american-catholic.com/2012/02/14/archbishop-chaput-hhs-mandate-dangerous-and-insulting/, last visited Feb. 14, 2012).

**Plaintiffs Eden Foods and Michael Potter**

76.     Plaintiff Eden Foods is a for-profit, natural foods company.

77.     Plaintiff Michael Potter cannot compartmentalize his conscience or his religious beliefs from his daily work and actions as the Chairman, President, and sole shareholder of Plaintiff Eden Foods.  Therefore, Plaintiff Michael Potter and Plaintiff Eden Foods share a common mission of conducting their business operations with integrity and consistent with the teachings, mission, and values of the Catholic Church.

78.     Plaintiffs Eden Foods and Michael Potter purchase and provide group insurance through Blue Cross/Blue Shield of Michigan and provide this insurance to their employees.

79.     Plaintiffs Eden Foods and Michael Potter strive to provide their employees with employee health coverage superior to coverage generally available in the Michigan market in order to be a competitive employer.

80.     Plaintiffs Eden Foods and Michael Potter specifically designed their health insurance plan to exclude contraception and abortifacients in line with the religious beliefs of the Catholic faith.

81.     Moreover, as a part of his religious commitment to the authoritative teachings of the Catholic Church, Plaintiff Michael Potter steadfastly avoids practices that subvert the teaching of the Catholic Church such as providing or funding drugs, devices, services or procedures inconsistent with his Catholic faith.

82.     Plaintiffs Eden Foods and Michael Potter cannot provide, fund, or participate in health care insurance which covers artificial contraception or abortifacients, or related education and counseling, without violating their deeply held religious beliefs.

83.     Plaintiffs Eden Foods and Michael Potter cannot provide information or guidance to their employees regarding artificial contraception, abortifacients or related education and counseling, without violating their deeply held religious beliefs.

84.     With full knowledge of these aforementioned beliefs, Defendants issued an administrative rule ("the Mandate") that runs roughshod over Plaintiffs' religious beliefs, and the beliefs of millions of other Americans.

85.     The Mandate not only forces Plaintiffs to finance contraception, abortifacients, and related education and counseling as health care, but also subverts the expression of Plaintiffs'

religious beliefs, and the beliefs of millions of other Americans, by forcing Plaintiffs to fund, promote, and assist others to acquire services which Plaintiffs believe involve almost always immoral and unnatural practices.

86.    The Mandate unconstitutionally coerces Plaintiffs to violate their deeply-held religious beliefs under threat of directly violating their consciences, in addition to any imposed fines and penalties.  Having to pay a fine to the taxing authorities or being entirely forced out of the insurance market in order to ensure the privilege of practicing one's religion substantially burdens Plaintiffs' religious liberty under the First Amendment.

87.    The Mandate strips the Plaintiffs of any choice to select an insurance plan that does not cover and finance contraception and abortifacients, as the Mandate requires that all insurance issuers provide this coverage.

88.    Plaintiffs' plan is not considered "grandfathered" and is subject to the provisions of the Mandate.

89.    Due to the Mandate, Plaintiffs are no longer allowed to exclude contraception and abortifacients from their insurance plan—and are forced to provide and pay for these services which violate their religious beliefs.

90.    Plaintiffs, since Plaintiff Eden Foods' inception, have excluded objectionable coverage such as providing contraception and abortifacients from their insurance plan.

91.    On February 21, 2013 when presented with a contract by its insurance issuer Blue Cross/Blue Shield of Michigan to change Plaintiffs' group insurance plan to include the objectionable contraception and abortifacients coverage, Plaintiffs objected and refused to sign the contract.

92.     Without Plaintiffs' consent or authority, Blue Cross/Blue Shield of Michigan in compliance with the Mandate changed Plaintiffs' plan to include the objectionable contraception and abortifacients coverage.

93.     Plaintiffs, as well as the employees and agents of Plaintiff Eden Foods, learned that objectionable contraception and abortifacients coverage had been recently added to Plaintiffs' group insurance plan *without their consent or authority* on March 15, 2013.

94.     Plaintiffs wish to conduct their business in a manner that does not violate the principles of their religious faith.

95.     Complying with the Mandate requires a direct violation of the Plaintiffs' religious beliefs because it requires Plaintiffs to pay for and assist others in paying for or obtaining not only contraception, but also abortion, because certain drugs and devices such as the "morning-after pill," "Plan B," and "ella" come within the Mandate's and Health Resources and Services Administration's definition of "Food and Drug Administration-approved contraceptive methods" despite their known abortifacient mechanisms of action.

96.     Defendants' refusal to accommodate the conscience of the Plaintiffs, and of other Americans who share the Plaintiffs' religious views, is highly selective.  Numerous exemptions exist in the Affordable Care Act which appear arbitrary and were granted to employers who purchase group insurance.  This evidences that Defendants do not mandate that all insurance plans need to cover "preventative services" (e.g. the thousands of waivers from the Affordable Care Act issued by Defendants for group insurance based upon the commercial convenience  of large corporations, the age of the insurance plan, or the size of the employer).

97.     Despite granting waivers upon a seemingly arbitrary basis, no exemption exists for an employer or individual whose religious conscience instructs him that certain mandated

services are unethical, immoral, and volatile to one's religious beliefs.   Defendants' Mandate fails to give the same level of weight or accommodation to the exercise of one's fundamental First Amendment freedoms that it assigns to the yearly earnings of a corporation.

98.   The Defendants' actions violate Plaintiffs' right to freedom of religion, as secured by the First Amendment to the United States Constitution and civil rights statutes, including the Religious Freedom Restoration Act (RFRA).

99.   Furthermore, the Mandate is also illegal because it was imposed by Defendants without prior notice or sufficient time for public comment, and otherwise violates the Administrative Procedure Act, 5 U.S.C. § 553.

100.   Had Plaintiffs' religious beliefs, or the beliefs of the millions of other Americans who share Plaintiffs' religious beliefs been obscure or unknown, the Defendants' actions might have been an accident.   But because the Defendants acted with full knowledge of those beliefs, and because they arbitrarily exempt some plans for a wide range of reasons other than religious conviction, the Mandate can be interpreted as nothing other than a deliberate attack by the Defendants on the Catholic Church, the religious beliefs held by Plaintiffs and the similar religious beliefs held by millions of other Americans.   The Defendants have, in sum, intentionally used government power to force individuals to believe in, support, and endorse the mandated services manifestly contrary to their own religious convictions, and then to act on that coerced belief, support, or endorsement.   Plaintiffs seek declaratory and injunctive relief to protect against this attack.

**The Affordable Care Act**

101.   In March 2010, Congress passed, and President Obama signed into law, the "Patient Protection and Affordable Care Act" (Pub. L. 111-148, March 23, 2010, 124 Stat. 119)

and the "Health Care and Education Reconciliation Act" (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (referred to in this complaint as the "Affordable Care Act").

102.   The Affordable Care Act regulates the national health insurance market by directly regulating "group health plans" and "health insurance issuers."

103.   The Affordable Care Act does not apply equally to all insurers.

104.   The Affordable Care Act does not apply equally to all individuals.

105.   The Affordable Care Act requires employers with more than 50 full-time employees or full-time employee equivalents to provide federal government-approved health insurance or pay a substantial per-employee fine.  (26 U.S.C. § 4980H).

106.   Plaintiff Eden Foods employs over 50 full-time employees or full-time equivalents.

107.   Plaintiff Eden Foods constitutes a "single employer" for purposes of the Affordable Care Act as defined at 42 U.S.C. § 18024(b)(4)(A).

108.   Plaintiff Eden Foods, as well as Plaintiff Michael Potter as the Chairman, President, and sole shareholder of Eden Foods must provide federal government-approved health insurance under the Affordable Care Act or pay substantial per-employee fines.

109.   The Affordable Care Act purports to not apply to the failure to offer employer-sponsored insurance to employers with fewer than 50 employees, not counting seasonal workers. 26 U.S.C. § 4980H(c)(2)(A).

110.   However, even employees with fewer than 50 employees purchase insurance from health insurance issuers, who are subject to the Affordable Care Act.  42 USC § 300GG-13 (a)(1),(4).

111.    Certain provisions of the Affordable Care Act do not apply equally to members of certain religious groups. *See, e.g.*, 26 U.S.C. § 5000A(d)(2)(A)(i) and (ii) (individual mandate does not apply to members of "recognized religious sect or division" that conscientiously objects to acceptance of public or private insurance funds); 26 U.S.C. § 5000A(d)(2)(B)(ii) (individual mandate does not apply to members of "health care sharing ministry" that meets certain criteria).

112.    Plaintiffs do not qualify for an individual exemption under 26 U.S.C. § 5000A(d)(2)(A)(i) and (ii) as Plaintiffs do not object to acceptance of public or private insurance funds in their totality and currently enjoy health insurance benefits that exclude contraceptives and abortifacients.

113.    The Affordable Care Act's preventive care requirements do not apply to employers who provide so-called "grandfathered" health care plans.

114.    Employers who follow HHS guidelines may continue to use grandfathered plans indefinitely.

115.    Plaintiffs' current insurance plans do not qualify as "grandfathered" health care plans, and are considered "non-grandfathered."

116.    Furthermore, Plaintiffs do not qualify for the "religious employer" exemption contained in 45 CFR § 147.130 (a)(1)(A) and (B).

117.    There have been changes made to Plaintiffs' plan after 2010, and participants have never been notified of a "grandfathered" status.

118.    Furthermore, Plaintiffs are not eligible for "grandfathered" status under the Affordable Care Act and will be subject to the requirements of the Affordable Care Act and the Health and Human Services Mandate because: (1) the health care plan does not include the required "disclosure of grandfather status" statement; (2) Plaintiffs do not take the position that

its health care plan is a grandfathered plan and thus does not maintain the records necessary to verify, explain, or clarify its status as a grandfathered plan nor will it make such records available for examination upon request; and (3) the health care plan has an increase in a percentage cost-sharing requirement measured from March 23, 2010. *See* 42 U.S.C. § 18011(a)(2); 26 C.F.R. § 54.9815-1251T; 29 C.F.R. § 2590.715-1251; 45 C.F.R. §147.140.

119.   Since the Plaintiffs do not qualify for the "religious employer" exemption, they are not permitted to take advantage of the "temporary safe-harbor" as set forth by the Defendants at 77 Fed. Register 8725 (Feb. 15, 2012).

120.   Plaintiffs are thus subjected to the Mandate now and are confronted with choosing between complying with its requirements in violation of their religious beliefs or violating federal law.

121.   Plaintiffs Eden Foods and Michael Potter must choose between complying with the requirements of the Affordable Care Act in violation of their religious beliefs or paying ruinous fines that would have a crippling impact on their ability to survive economically.

122.   Plaintiffs Eden Foods and Michael Potter must provide federal government-approved health insurance under the Affordable Care Act or pay substantial per-employee fines.

123.   Under 26 U.S.C. § 4980H since Plaintiffs have over fifty full-time employees, if Plaintiffs do not meet the "minimum essential coverage" requirements (i.e. do not provide contraception, abortion, and abortifacients) Plaintiffs could owe $2,000 per year for each full-time employee excluding the first thirty full-time employees.   The tax penalty assessable payment calculation would generally be: (128 employees - 30) x $2,000 per year = $196,000 per year tax penalty.

124.    Under the United States Internal Revenue Code, 26 U.S.C. § 4980D(a), there is a tax imposed on any failure of a group plan to meet the requirements of Chapter 100 (relating to group plan requirements).  Under 26 U.S.C. § 4980D(b), the amount of the tax is $100 for each day in the non-compliance period with respect to each individual to whom such failure relates. This tax penalty would generally be: 128 employees x 365 days per year x $100 each day = $4,672,000 per year tax.

125.    Plaintiffs are collectively confronted with complying with the requirements of the Affordable Care Act in violation of their religious beliefs or removing themselves and employees from the health insurance market in its entirety—endangering the health and economic stability of their employees and forcing Plaintiff Eden Foods to be non-competitive as employers in a market where other, non-Catholic employers will be able to provide insurance to their employees under the Affordable Care Act without violating their religious beliefs.

126.    The Affordable Care Act is not generally applicable because it provides for numerous exemptions from its rules.

127.    The Affordable Care Act is not neutral because some groups, both secular and religious, enjoy exemptions from the law, while certain religious groups do not.  Some groups, both secular and religious, have received waivers from complying with the provisions of the Affordable Care Act, while others—such as the Plaintiffs—have not.

128.    The Affordable Care Act creates a system of individualized exemptions.

129.    The United States Department of Health and Human Services has the authority under the Affordable Care Act to grant compliance waivers ("HHS waivers") to employers and other health insurance plan issuers.

130.    HHS waivers release employers and other plan issuers from complying with the provisions of the Affordable Care Act.

131.    HHS decides whether to grant waivers based on individualized waiver requests from particular employers and other health insurance plan issuers.

132.    Upon information and belief, more than a thousand HHS waivers have been granted.

**The "Preventive Care" Mandate**

133.    A provision of the Affordable Care Act mandates that health plans "provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" and directs the Secretary of United States Department of Health and Human Services to determine what would constitute "preventive care" under the mandate.  42 U.S.C § 300gg–13(a)(4).

134.    On July 19, 2010, HHS, along with the United States Department of Treasury and the United States Department of Labor, published an interim final rule under the Affordable Care Act.  75 Fed. Reg. 41726 (2010).  The interim final rule required providers of group health insurance to cover preventive care for women as provided in guidelines to be published by the Health Resources and Services Administration at a later date.  75 Fed. Reg. 41759 (2010).

135.    On February 15, 2012, the United States Department of Health and Human Services promulgated a mandate that group health plans include coverage for all Food and Drug Administration-approved contraceptive methods and procedures, patient education, and counseling for all women with reproductive capacity in plan years beginning on or after August 1, 2012 (hereafter, "the Mandate").  *See* 45 CFR § 147.130 (a)(1)(iv), as confirmed at 77 Fed.

Register 8725 (Feb. 15, 2012), adopting and quoting Health Resources and Services Administration (HRSA) Guidelines, (http://www.hrsa.gov/womensguidelines).

136.    The Mandate was enacted pursuant to statutory authority under the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119, as amended by the Health Care and Education Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029 (ACA). 77 Fed. Reg. 31, 8725 ("Affordable Care Act").

137.    In its ruling, HHS included all FDA-approved contraceptives under the banner of preventive services, including contraception, abortion, and abortifacients such as the "morning-after pill," "Plan B," and "ella," a close cousin of the abortion pill RU-486. (http://www.hrsa.gov/womensguidelines).

138.    The Mandate's reach seeks to control the decisions of employers, individuals and also the decisions of *all* insurance issuers (i.e. "Blue Cross/Blue Shield of Michigan," etc.).  42 USC § 300gg-13 (a)(1),(4). ("A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force; . . . with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.").

139.    *All* insurance issuers are mandated to include contraception, abortion, and abortifacients such as the "morning-after pill," "Plan B," and "ella" in *all* of its group *and* individual plans, not specifically exempted, beginning as of August 1, 2012 and effective on the anniversary of the employer's plan year.

140.    Individuals and employers, regardless of the number of employees they employ, will eventually be forced to select an insurance plan which includes what HHS deemed "preventive care."

141.    All individuals and employers will be stripped of their choice not to pay for the "preventive care," regardless of whether paying for such "services" violates one's conscience or deeply held religious beliefs.

142.    Health insurance issuers include insurance companies such as Blue Cross/Blue Shield of Michigan, which is the insurance issuer used by Plaintiffs.

143.    The Mandate reaches even further than the Affordable Care Act to eliminate all employers and individuals from selecting a health insurance plan in which the insurance issuers do not automatically provide contraception and abortifacients.

144.    Prior to promulgating the Mandate, HHS accepted public comments to the 2010 interim final regulations from July 19, 2010 to September 17, 2010.  Upon information and belief, a large number of groups filed comments, warning of the potential conscience implications of requiring religious individuals and groups to pay for certain kinds of services, including contraception and abortifacients.

145.    HHS directed a private health policy organization, the Institute of Medicine ("IOM"), to suggest a list of recommended guidelines describing which drugs, procedures, and services should be covered by all health plans as preventative care for women. (http://www.hrsa.gov/womensguidelines, last visited March 6, 2013).

146.    In developing its guidelines, IOM invited a select number of groups to make presentations on the preventive care that should be mandated by all health plans.  These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists (ACOG), John

Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America and Sara Rosenbaum. (http://www.nap.edu/openbook.php?record_id=13181&PAGE=217, last visited March 6, 2013).

147.   No religious groups or other groups that oppose government-mandated coverage of contraception, abortifacients, and related education and counseling were among the invited presenters.

148.   One year after the first interim final rule was published, on July 19, 2011, the IOM published its recommendations.  It recommended that the preventative services include "All Food and Drug Administration approved contraceptive methods."  (Institute of Medicine, Clinical Preventive Services for Women: Closing the Gaps (July 19, 2011)).

149.   Preventative services therefore include FDA-approved contraceptive methods such as birth-control pills; prescription contraceptive devices, including IUDs; Plan B, also known as the "morning-after pill"; and ulipristal, also known as "ella" or the "week-after pill"; and other drugs, devices, and procedures.

150.   Plan B and "ella" can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo.  The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law and Catholic teaching.  Consequently, Plan B and "ella" are abortifacients.

151.   Thirteen days later, on August 1, 2011, without notice of rulemaking or opportunity for public comment, HHS, the United States Department of Labor, and the United States Department of Treasury adopted the IOM recommendations in full and promulgated an interim final rule ("the Mandate"), which requires that all "group health plan[s] and . . . health

insurance issuer[s] offering group or individual health insurance coverage" provide all FDA-approved contraceptive methods and procedures. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130.  Health Resources and Services Administration issued guidelines adopting the IOM recommendations.  (http://www.hrsa.gov/womensguidelines, last visited March 6, 2013).

152.    The Mandate also requires group health care plans and insurance issuers to provide education and counseling for all women beneficiaries with reproductive capacity.

153.    The Mandate went into effect immediately as an "interim final rule."

154.    HHS did not take into account the concerns of religious organizations in the comments submitted before the Mandate was issued.

155.    Instead the Mandate was unresponsive to the concerns stated in the comments submitted by religious organizations.

156.    When it issued the Mandate, HHS requested comments from the public by September 30th and indicated that comments would be available online.

157.    Upon information and belief, over 100,000 comments were submitted against the Mandate.

158.    On October 5, 2011, six days after the comment period ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America.  She told the assembled crowd that "we are in a war." She did not state whom she and NARAL Pro-Choice America were warring against.

159.    During a Congressional hearing on April 26, 2012, Defendant Sebelius admitted that she is totally unfamiliar with the United States Supreme Court religious freedom cases.

160. Defendant Sebelius showed little concern for the constitutional issues involved in promulgating the Mandate. At the aforementioned congressional hearing, she admitted that prior to issuing the Mandate she did not review any written materials or any sort of legal memo from her general counsel discussing the effects of the Mandate on religious freedom.

161. The Mandate fails to take into account the statutory and constitutional conscience rights of religious business owners and for profit companies that exercise business practices in compliance with certain faith practices, such as Plaintiffs Michael Potter and Eden Foods, a subject of comment.

162. The Mandate requires that Plaintiffs assist, provide, or fund coverage for contraception, abortifacients, and related education and counseling against its conscience in a manner that is contrary to law.

163. The Mandate constitutes government-imposed pressure and coercion on Plaintiffs to change or violate their religious beliefs.

164. The Mandate exposes Plaintiff Eden Foods and Plaintiff Michael Potter, as individuals and as employers or companies with over 50 full-time employees, to substantial fines for refusal to change or violate their religious beliefs.

165. The Mandate imposes a burden on Plaintiffs' employee recruitment efforts by creating uncertainty as to whether Plaintiffs will be able to offer health insurance.

166. The Mandate places Plaintiffs at a competitive disadvantage in their efforts to recruit and retain employees and members.

167. Furthermore as a Christian, his religious beliefs and the principle of stewardship require that Plaintiff Michael Potter care for his employees by providing insurance coverage for them and their families.

168.    The Mandate forces Plaintiffs to provide, fund, or approve and assist its employees and members in purchasing contraception and abortifacient drugs in violation of Plaintiffs' religious beliefs that doing so is immoral and unnatural.

169.    Plaintiffs have a sincere religious objection to providing coverage for emergency contraceptive drugs such as Plan B and "ella" since they believe those drugs could prevent a human embryo, which they understand to include a fertilized egg before it implants in the uterus, from implanting in the wall of the uterus, causing the death of a person.

170.    Plaintiffs consider the prevention by artificial means of the implantation of a human embryo to be an abortion.

171.    Plaintiffs believe that Plan B and "ella" can cause the death of the embryo, which is a person.

172.    Plan B can prevent the implantation of a human embryo in the wall of the uterus.

173.    "Ella" can prevent the implantation of a human embryo in the wall of the uterus.

174.    Plan B and "ella" can cause the death of the embryo.

175.    The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus constitutes an "abortion" as that term is used in federal law.

176.    The use of artificial means to cause the death of a human embryo constitutes an "abortion" as that term is used in federal law.

177.    The Mandate forces Plaintiffs to provide emergency contraception, including Plan B and "ella," free of charge, regardless of the ability of insured persons to obtain these drugs from other sources.

178.    The Mandate forces Plaintiffs to fund education and counseling concerning contraception and abortifacients that directly conflicts with Plaintiffs' religious beliefs and teachings.

179.    Plaintiffs could not cease in providing its employees with health insurance coverage without violating their religious duty to provide for the health and well-being of their employees and their families.   Additionally, employees would be unable to attain similar coverage in the market as it now exists.

180.    The Mandate forces Plaintiffs to choose between violating their religious beliefs, incurring substantial fines, or terminating their employee or individual health insurance coverage.

181.    Group health plans and insurance issuers are subject to the Mandate.

182.    Without relief and intervention from the Court, Plaintiffs are subject to the Mandate.

183.    Plaintiffs have already had to devote significant institutional resources, including both staff time and funds, to determine how to respond to the Mandate.   Plaintiffs anticipate continuing to make such expenditures of time and money regarding the Mandate and its effect on Plaintiffs' plan.

**The Narrow and Discretionary Religious Exemption**

184.    The Mandate indicates that the Health Resources and Services Administration ("HRSA") "may" grant religious exemptions to certain religious employers. 45 C.F.R. § 147.130(a)(iv)(A).

185.    The Mandate allows HRSA to grant exemptions for "religious employers" who "meet[ ] all of the following criteria: (1) The inculcation of religious values is the purpose of the

organization. (2) The organization primarily employs persons who share the religious tenets of the organization. (3) The organization serves primarily persons who share the religious tenets of the organization. (4) The organization is a *nonprofit* organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.130(a)(iv)(B).

186.    The Mandate imposes no constraint on HRSA's discretion to grant exemptions to some, all, or none of the organizations meeting the Mandate's definition of "religious employers."

187.    HHS stated that it based the exemption on comments on the 2010 interim final rule. 76 Fed. Reg. 46621.

188.    There is *no* exemption for a *for-profit* company.

189.    Plaintiffs, as confirmed by the unilateral decisions of Plaintiffs' insurance issuer (Blue Cross/Blue Shield of Michigan), are subject to the Mandate despite the existence of exemptions to the Mandate as none of the exemptions apply to Plaintiffs.

190.    On January 20, 2012, Defendant Sebelius announced that there would be no change to the religious exemption. She added that "[n]onprofit employers who, based on religious beliefs, do not currently provide contraceptive coverage in their insurance plan, will be provided an additional year, until August 1, 2013, to comply with the new law," on the condition that those employers certify they qualify for the extension. At the same time, however, Sebelius announced that HHS "intend[s] to require employers that do not offer coverage of contraceptive services to provide notice to employees, which will also state that contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support." *See* Statement by U.S. Department of Health and Human Services Secretary

Kathleen Sebelius, (http://www.hhs.gov/news/press/2012pres/01/20120120a.html).   To date, Defendant HHS has not released any official rule implementing either the one-year extension or the additional forced-speech requirement that applies to either Plaintiff.

191.    It is inevitable with the current state of the law that Plaintiffs currently are forced to comply with the Mandate, despite the fact that doing so violates the teachings of the Catholic faith and Plaintiffs' deeply held religious beliefs by directly providing, funding, and/or allowing its members to engage in disseminating information and guidance about where to obtain contraception or abortifacient services.

## CLAIMS

### COUNT I
### (Free Exercise of Religion—Violation of the First Amendment

192.    Plaintiffs incorporate by reference all preceding paragraphs.

193.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for contraception, abortifacients, and related education and counseling violates Plaintiffs' right to the free exercise of religion guaranteed by the First Amendment to the United States Constitution.

194.    Plaintiffs' sincerely held religious beliefs prohibit them from providing insurance coverage for contraception, abortifacients, and related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

195.    Plaintiffs' sincerely held religious beliefs prohibit them from providing access to contraception, abortifacients, and related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise

196.    The Affordable Care Act's requirement that Plaintiffs provide health insurance that covers (or provides access to) contraception, abortifacients, and related education and counseling substantially burdens Plaintiffs' sincerely-held religious beliefs.

197.    The Affordable Care Act's requirement that Plaintiffs provide health insurance that covers (or provides access to) contraception, abortifacients, and related education and counseling chills Plaintiffs' religious exercise.

198.    Plaintiffs must choose between being forced to purchase health insurance for their employees that covers (or provides access to) contraception, abortifacients, and related education and counseling or paying substantial penalty fines.

199.    The Affordable Care Act's requirement that employers provide health insurance that covers (or provides access to) contraception, abortifacients, and related education and counseling creates government-imposed coercive pressure on Plaintiffs to change or violate their sincerely-held religious beliefs.

200.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines does not further any compelling governmental interest.

201.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines is not the least restrictive means to accomplish any permissible governmental interest.

202.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and

counseling or incur substantial penalty fines is a restriction on the free exercise of religion that is not narrowly tailored to advance any permissible governmental interest.

203.     The Affordable Care Act's requirement that employers provide health insurance that covers (or provides access to) contraception, abortifacients, and related education and counseling does not accommodate Plaintiffs' sincerely-held religious beliefs.

204.     The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines is not a neutral law of general applicability.

205.     Notwithstanding its receipt of multiple objections to the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling on the basis that it would violate certain persons' sincerely-held religious beliefs, Defendants designed that requirement and its "religious employer" exemption in a way that makes it impossible for Plaintiffs to comply with their religious beliefs.

206.     The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling is official action that targets religious conduct and beliefs for distinctive, discriminatory, and adverse treatment.

207.     Defendants promulgated the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling in order to suppress Plaintiffs' and other similarly situated persons' right to free exercise of religion.

208.    The Affordable Care Act's violation of Plaintiffs' right to the free exercise of religion has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

209.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

### COUNT II
### (Violation of the Religious Freedom Restoration Act)

210.    Plaintiffs incorporate by reference all preceding paragraphs.

211.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines violates the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, et. seq.).

212.    Plaintiffs' sincerely held religious beliefs prohibit them from providing insurance coverage for (or access to) contraception, abortifacients, and related education and counseling. Plaintiffs' compliance with these beliefs is a religious exercise.

213.    The Affordable Care Act's requirement that Plaintiffs provide health insurance that covers (or provides access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines substantially burdens Plaintiffs' sincerely-held religious beliefs.

214.    The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines does not further any compelling governmental interest.

215.   The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines is not the least restrictive means to accomplish any permissible governmental interest.

216.   The Affordable Care Act's violation of the Religious Freedom Restoration Act has caused, and will continue to cause, Plaintiffs to suffer undue hardship and irreparable injury.

217.   Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional rights.

## COUNT III
### (Violation of the Administrative Procedure Act)

218.   Plaintiffs incorporate by reference all preceding paragraphs.

219.   Because the Affordable Care Act itself does not specify a standard for judicial review, it is subject to review under the default standard of the Administrative Procedure Act. 5 U.S.C. § 706(2). At issue in this lawsuit is whether adoption of the Act's requirement that employers provide insurance plans that include coverage for contraception,  abortifacients, and related education and counseling or incur substantial penalty fines (i.e., contraceptive services mandate) was "without observance of procedure required by law" and/or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

220.   The Administrative Procedure Act requires general notice of a proposed rulemaking and an opportunity for public comment before promulgation of a rulemaking, unless the agency, for good cause, finds that notice and public comment thereon are impracticable, unnecessary, or contrary to the public interest. 5 U.S.C. § 551, et seq.

221.   Defendant Departments purported to find good cause to forego public comment on the August 3, 2011, interim final regulations on the Affordable Care Act's contraceptive

services mandate on the basis that the public had the opportunity to comment on the previous interim final rule issued on July 19, 2010. 76 Fed. Reg. 46621 (Aug. 3, 2011)

222.    The July 19, 2010, interim final rule, however, did not include HRSA's Women's Preventive Services: Required Health Plan Coverage Guidelines, which mandated the coverage for contraception, abortifacients, and related education and counseling.  Accordingly, the public was deprived of the opportunity to comment on the contraceptive services mandate in the preventive services provision of the Affordable Care Act.

223.    Because Defendant Departments took agency action "not in observance of procedure required by law," Plaintiffs are entitled to relief under 5 U.S.C. § 706(2)(D).

224.    Similarly, Defendant Departments' decision to adopt the August 3, 2011, interim final regulations was made without considering the public's comments on the specific preventive procedures mandated therein, including coverage for contraception, abortifacients, and related education and counseling. Therefore, its action was "arbitrary, capricious, [and] an abuse of discretion."  Plaintiffs are therefore also entitled to relief under 5 U.S.C. § 706(2)(A).

225.    Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"—(i.e., Title I of the Act, which includes the provision dealing with "preventive services")—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

226.    Further, the Weldon Amendment to the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009 prevents federal, state, and local governments from receiving certain federal funds if they discriminate against health care providers, including health insurance plans, that refuse to provide, pay for, provide coverage of, or refer for abortions. Pub. L. 110 329, Div. A, Section 101 (Sept. 30, 2008) 122 Stat. 3574,

3575. This "conscience clause" is designed to prevent discrimination against health care providers who have a moral objection to abortion.

227.   The Affordable Care Act's requirement that employers provide insurance plans that include coverage for contraception, abortifacients, and related education and counseling includes "[a]ll Food and Drug Administration approved contraceptive methods."

228.   Federal Drug Administration-approved contraceptive methods include, among other drugs, devices and procedures, birth control pills, prescription contraceptive devices, Plan B (also known as the "morning after pill"), and ulipristal (also known as "ella" or the "week after pill").

229.   Plan B and ella can prevent the implantation of a human embryo in the wall of the uterus and can cause the death of an embryo. The use of artificial means to prevent the implantation of a human embryo in the wall of the uterus or to cause the death of an embryo each constitute an "abortion" as that term is used in federal law. Consequently, Plan B and ella cause abortions.

230.   The Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraceptives that cause abortions violates Section 1303(b)(1)(A) of the Affordable Care Act and the Weldon Amendment.

231.   As set forth above, the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or incur substantial penalty fines violates the free exercise of religion and the free speech guarantees of the First Amendment and the Religious Freedom Restoration Act.

232.    Because the Affordable Care Act's requirement that employers provide insurance plans that include coverage for (or access to) contraception, abortifacients, and related education and counseling or pay substantial penalty fines is "contrary to existing law," Plaintiffs are further entitled to relief under 5 U.S.C. § 706(2)(A).

233.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their constitutional and statutory rights.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment as follows:

A.    That this court declare that the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, abortifacients, and related education and counseling or incur substantial penalty fines violates the First Amendment to the United States Constitution;

B.    That this court declare that the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, abortifacients, and related education and counseling or incur substantial penalty fines violates the Religious Freedom Restoration Act;

C.    That this court declare that the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, abortifacients, and related education and counseling or incur substantial penalty fines was issued in violation of the Administrative Procedure Act;

D.    That this court issue an order preliminarily and permanently prohibiting Defendants from enforcing the Affordable Care Act's requirement that employers provide insurance plans that include coverage for, or access to, contraception, abortifacients, and related

education and counseling or incur substantial penalty fines against Plaintiffs, their group health

plans, or the group health insurance coverage provided in connection with such plans;

E.      That this court award Plaintiffs their reasonable costs, including attorneys' fees,

pursuant to 28 U.S.C. § 2412, 5 U.S.C. § 504, 42 U.S.C. § 2000bb-1, and the general legal and

equitable powers of this court;

F.      That this court grant such other and further relief as it deems equitable and just

under the circumstances.

Respectfully submitted,

THOMAS MORE LAW CENTER

 /s/   Erin Elizabeth Mersino
Erin Elizabeth Mersino, Esq. (P70886)
Richard Thompson, Esq. (P21410)
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
Tel (734) 827-2001
emersino@thomasmore.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2013, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to all parties for whom counsel has entered an appearance by

operation of the Court's electronic filing system.   Parties may access this filing through the

Court's system.   I certify that a copy of the foregoing has been served by ordinary U.S. Mail

upon all parties for whom counsel has not yet entered an appearance electronically: None.

THOMAS MORE LAW CENTER

s/ Erin Mersino_____
Erin Mersino, Esq. (P70886)

40